**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

_____

DRUCILLA PAGE )
         )
    **Plaintiff,** )
         )
    **v.** )        **Civil Action No. WGC-14-1508**
         )
SUPERVALU, INC. )
         )
    **Defendant.** )
_____)

### MEMORANDUM OPINION

Plaintiff Drucilla Page ("Ms. Page") brought this action against Defendant Supervalu, Inc., doing business as Shoppers Food Warehouse ("Supervalu"), alleging negligence and seeking in excess of $75,000 in damages.  The parties consented to proceed before a United States Magistrate Judge for all further proceedings in the case and the entry of a final judgment. *See* ECF No. 10.  The case thereafter was referred to the undersigned.  *See* ECF No. 12.

Pending before the court and ready for resolution are Supervalu's Motion for Summary Judgment (ECF No. 16) and Supervalu's Motion *in Limine* to Exclude Plaintiff's Expert Barry Erik Parsons, FMP (ECF No. 17).  Ms. Page filed oppositions to each motion, *see* ECF Nos. 18, 19, and Supervalu filed replies in support of its motions, *see* ECF Nos. 20, 21.

Supervalu requests an oral hearing for each motion.  *See* ECF No. 16 at 2; ECF No. 17 at 3.  No hearing is deemed necessary and therefore both requests are **denied**.  The court now rules pursuant to Local Rule 105.6 (D. Md. 2014).

## BACKGROUND

On September 12, 2013 Ms. Page visited the Shoppers Food Warehouse grocery store located at 6111 Livingston Road, Oxon Hill, Maryland 20745. She arrived between 11:30 a.m. and 12:00 p.m. Ms. Page recounted the sequence of events surrounding her slip-and-fall during her deposition.

> Q     Let's talk about this accident. Tell me what happened.
>
> A     I was on my way – – I just come from the gym as I always do. And I come in there and I went over to the fruit section and I reached for a slice of watermelon, I reached for strawberries, I turned around and walked away and slid across the floor.
>
> *                                   *                                   *
>
> Q     How long had you been in the store before you fell?
>
> A     Maybe a good five minutes.
>
> Q     Okay. Did you go directly from entering the store right to the produce department?
>
> A     Yes.
>
> Q     You said you grabbed – – I thought you said you grabbed watermelon and did you grab something else before you fell?
>
> A     Yes. A slice of watermelon and a pack of strawberries.
>
> Q     Did you have a shopping cart with you or hand cart?
>
> A     No.
>
> Q     You had neither?
>
> A     No.
>
> Q     So obviously when you slipped, both things were still in your hands?
>
> A     Yes.

Q       When you slipped, did you fall down to the ground, down to the floor?

A       Yes.

Q       What's the first part of your body that hit the floor?

A       My buttocks.

Q       Do you know what caused you to fall?

A       The guy said it was fruit on the floor.

Q       What guy?

A       The guy in the seafood.

Q       Store employee?

A       Yes.

Q       He arrived after you fell?

A       Yes.

Q       Okay.  Did you see any fruit on the floor before you fell?

A       No.

Q       Do you know how the fruit got on the floor?

A       No.

Q       Do you know how long it was on the floor before you fell?

A       No.

Q       When you first entered the produce department, you didn't see any fruit on the floor?

A       When I first entered the produce department, I didn't look down.  I just kept going to the fruit I was going after.

Q       Okay.  But just so I'm clear, you didn't see anything?

A       No.

> Q      You didn't see any footprints or cart marks through the produce department tracking juice, water, fluid, did you?
>
> A      No.
>
> Q      Did anybody ever tell you they saw the substance on the floor before you fell?
>
> A      No.

ECF No. 16-2 at 2-3 (Page Dep. 14:18 - 15:2, 15:16 - 18:5); ECF No. 18-1 at 2-3 (Page Dep. 14:18 - 15:2, 15:16 - 18:5).

On the day of this incident Ms. Page filled out and signed a one page Supervalu Customer Statement Form.   Ms. Page wrote in pertinent part, "I picked up a watermelon & strawberries and turned to walk away when I slipped and fell on my leg and left side butt cheek." ECF No. 18-8 at 3.

James Charles Hunter, III was a co-manager of the Shoppers Food Warehouse ("Shoppers") grocery store in Oxon Hill on the day Ms. Page slipped and fell.   As part of his duties he walked the store at least once an hour.   Mr. Hunter walked the store before Ms. Page fell but does not know the exact time of this walk.   ECF No. 18-4 at 3 (Hunter Dep. 13:2 - 15:6). After learning about Ms. Page's fall, Mr. Hunter completed an internal incident report.   In that report Mr. Hunter answered "no" to the query concerning "possible third party liability."   *See* ECF No. 18-8 at 2.

## JURISDICTION AND VENUE

Subject matter jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.   At the time she filed her Complaint Ms. Page resided in the District of Columbia. Supervalu is incorporated in Delaware and its principal place of business is in Minnesota.   The amount in controversy exceeds $75,000, exclusive of interest and costs.   Pursuant to 28 U.S.C. §

1391 venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## STANDARD OF REVIEW

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950).  The moving party bears the burden of showing that there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(a); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Celotex Corp.*, 477 U.S. at 323.

On those issues where the nonmoving party will have the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence.  *Anderson*, 477 U.S. at 256.  However, "'[a] mere scintilla of evidence is not

enough to create a fact issue.'" *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984)

(quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388

F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)).  There must be "sufficient evidence

favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted."

*Anderson*, 477 U.S. at 249-50 (citations omitted).

## DISCUSSION

A.    *Overview – Premises Liability*

Before addressing the parties' positions regarding genuine issues as to any material fact,

the court must address some preliminary matters.  Since this court's jurisdiction is based on

diversity of citizenship, the principles outlined in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78

(1938) require the application of Maryland law to substantive law questions.  Under Maryland

law a property owner owes a certain duty to an individual who comes in contact with the

property, and the scope of the duty owed is dependent upon the individual's status while on the

property. *Baltimore Gas & Elec. Co. v. Flippo*, 348 Md. 680, 688, 705 A.2d 1144, 1148 (1998).

Maryland law recognizes four categories of individuals:  (1) an invitee, (2) a licensee by

invitation, (3) a bare licensee and (4) a trespasser.  An invitee is an individual who is on the

property for a purpose related to the landowner's business.  "An occupier of land has a duty to

use reasonable and ordinary care to keep the premises safe for an invitee and to protect him from

injury caused by an unreasonable risk that the invitee, by exercising ordinary care for his own

safety, will not discover."  *Henley v. Prince George's County*, 305 Md. 320, 339, 503 A.2d 1333,

1343 (1986).

A licensee by invitation is a social guest and the landowner "owes a duty to exercise reasonable care to warn the guest of dangerous conditions that are known to the [landowner] but not easily discoverable." *Flippo*, 348 Md. at 689, 705 A.2d at 1148 (citation omitted). For a bare licensee, a person on the property with permission but for his/her own purposes, a landowner only owes a duty to refrain from willfully or wantonly injuring the bare licensee and to refrain from creating "'new and undisclosed sources of danger without warning the [bare] licensee.'" *Id.* (citation omitted). For a trespasser, someone who intentionally and without permission enters another's property, a landowner owes no duty except refraining from willfully or wantonly injuring or entrapping the trespasser.

On September 12, 2013 Ms. Page was a customer at a Shoppers grocery store, owned by Supervalu, in Oxon Hill, Maryland. She visited the store to purchase some produce. Ms. Page was in the store for a purpose related to Supervalu's business. Ms. Page was thus an invitee.

B.     *Negligence*

Under Maryland law, to establish a *prima facie* case of negligence, Ms. Page must prove "'(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.'" *Valentine v. On Target*, 353 Md. 544, 549, 727 A.2d 947, 949 (1999) (citations omitted). Negligence means doing something a person using reasonable care would not do, or not doing something a person using reasonable care would do. *Maryland Civil Pattern Jury Instruction* 19:1. Ordinary or reasonable care means "that caution, attention or skill a reasonable person would use under similar circumstances." *Id.*

Supervalu owes a duty of ordinary care to keep its premises safe for an invitee such as Ms. Page.  That duty is defined as follows:

> [A]n owner or occupier of land only has a duty to exercise reasonable care to "protect the invitee from injury caused by an unreasonable risk" that the invitee would be unlikely to perceive in the exercise of ordinary care for his or her own safety, and about which the owner knows or could have discovered in the exercise of reasonable care.  The duties of a business invitor thus include the obligation to warn invitees of known hidden dangers, a duty to inspect, and a duty to take reasonable precautions against foreseeable dangers.

*Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md. App. 381, 388, 693 A.2d 370, 374 (1997) (internal citations omitted).

Supervalu is not an insurer of Ms. Page's safety while Ms. Page is on its premises.  "[N]o presumption of negligence on the part of the owner arises merely from a showing that an injury was sustained in his store." *Moulden v. Greenbelt Consumer Servs., Inc.*, 239 Md. 229, 232, 210 A.2d 724, 725 (1965).  Therefore, "[i]n an action by a customer to recover damages resulting from a fall in a store caused by a foreign substance on the floor or stairway, the burden is on the customer to produce evidence that the storekeeper created the dangerous condition or had actual or constructive knowledge of its existence." *Rawls v. Hochschild, Kohn & Co.*, 207 Md. 113, 119, 113 A.2d 405, 408 (1955).

C.    *Actual Knowledge*

Emanuel K. Cheston is the seafood manager at the Shoppers grocery store in Oxon Hill. During his deposition he recalled what he observed and what actions he took.

Q    Did you witness Ms. Page fall?

A    No, I didn't.

Q    Was there a time when you found out that Ms. Page had fell [sic]?

A        Yes.  From my department, I looked over in produce and she was on the floor.

Q        Okay.  The first time you saw her, where was she and in what position was she in?

A        She was down on her knees.

Q        On both knees?

A        Yes.

Q        And where was she in relation to the produce department?

A        Straight across from me in the grape area.

Q        In the photograph I showed you that's been marked as Exhibit 1, does this show the area where Ms. Page fell to your knowledge?

A        Right.  That's the grape area.

*                              *                              *

Q        Did you notice anything that she could have slipped on?

A        I just saw a grape on the floor.  I didn't know if she slipped on that or not.

Q        Okay.  One grape?  Multiple grapes?  What did this grape look like?  Was it smeared on the floor?

A        I didn't see but one, but it was smeared, yes.

*                              *                              *

Q        So after you noticed the grape that you had mentioned, the smeared grape, what did you do?

A        Well, after I took care of making sure that she was all right, I called the manager – – I went over and got her a chair first.  And when I brought the chair back, I made sure that she was sitting down.  Then I went to my phone and called the manager over to let him know what happened.  And then I got a paper towel and I wiped the grape up off the floor.

ECF No. 18-2 at 4-5 (Cheston Dep. 19:16 - 20:11, 21:9 - 16, 23:16 - 24:2).

Mr. Cheston's testimony does not prove Supervalu was aware of the grape on the floor *before* Ms. Page slipped and fell.  No other evidence has been presented that Supervalu was actually aware of the grape on the floor prior to Ms. Page's fall.  Ms. Page fails to meet her burden and therefore cannot demonstrate actual knowledge by Supervalu.

D.      *Constructive Knowledge*

Supervalu asserts Ms. Page has not produced any "time on the floor" evidence and thus Ms. Page cannot prove Supervalu's negligence.  In *Maans v. Giant of Maryland, LLC*, 161 Md. App. 620, 639-40, 871 A.2d 627, 638 (2005), the Court of Special Appeals of Maryland explained the purpose of "time on the floor" evidence.

> (1)   [I]t requires a demonstration of how long the dangerous condition existed prior to the accident so that the fact-finder can decide whether the storekeeper would have discovered it if he or she had exercised ordinary care; and (2) it also shows that the interval between inspections was at least as long as the time on the floor.  Thus, proof of time on the floor is relevant, not only as to notice but also as to the issue of what care was exercised.

With regard to "time on the floor" evidence Ms. Page claims, due to a question of fact, this issue cannot be resolved on a motion for summary judgment.  "The fact that no Shoppers' employees or customers were in the produce section for at least five (5) minutes prior to Page's fall and that Shoppers' managers could not remember the last time the produce section was inspected creates a question of fact on the issue of constructive notice." ECF No. 18 at 11.  Accordingly, Ms. Page argues, a jury must determine whether Supervalu had sufficient time to detect and remove or warn of the hazardous grapes.  Finally, Ms. Page asserts she is entitled to a negative inference based on Supervalu's conduct.  "Supervalu's failure to preserve the surveillance video entitles Page to a negative inference that the videos would support her

allegation that the grapes were located on the floor for an amount of time long enough so that an exercise of reasonable care would have discovered the condition." *Id.* at 12.

In its reply Supervalu notes Maryland law does not impose on store owners a duty of continuous inspections and immediate cleaning of spills or hazards.  A customer such as Ms. Page must demonstrate a hazardous or defective condition existed for an appreciable length of time.

> Plaintiff's Counsel's citation to the fact that the Plaintiff has executed an Affidavit which states that she does not recall seeing customers or employees in the produce section five minutes prior to her fall, and that the Defendant's employees who were deposed could not recall when the last time the produce section was inspected, is not sufficient to show that the defective condition existed for an appreciable length of time.  The Maryland courts have held that it is just as likely that the hazardous condition was created one minute before, as one hour before.  Without explicit proof, the jury would have to base any finding on pure speculation and conjecture, which is not permitted.

ECF No. 20 at 5-6 (footnote omitted, citation omitted).  Supervalu asserts Ms. Page has not presented any admissible evidence of Supervalu's constructive knowledge to establish a *prima facie* case of negligence.

Furthermore, Supervalu contends Ms. Page is not entitled to a negative inference.  To be entitled to such an inference, Ms. Page must prove spoliation.  A key element of spoliation is the demonstration of a culpable state of mind in the destruction of evidence.  "There is absolutely no evidence that this Defendant acted intentionally, with bad faith, or willingly, to destroy video surveillance footage.   Rather, the Plaintiff seems to maintain, simply because the video surveillance footage automatically taped over the Plaintiff's fall, that the [store operator's] inaction or failure to act is tantamount to spoliation.  The mere happening of an accident, without more, does not trigger a duty to preserve evidence." *Id.* at 9.

The court finds Ms. Page does not know and has not presented any evidence indicating the length of time the alleged grape was on the floor before she slipped and fell.

> Q      Did you see any fruit on the floor before you fell?
>
> A      No.
>
> Q      Do you know how the fruit got on the floor?
>
> A      No.
>
> Q      Do you know how long it was on the floor before you fell?
>
> A      No.
>
> Q      When you first entered the produce department, you didn't see any fruit on the floor?
>
> A      When I first entered the produce department, I didn't look down.  I just kept going to the fruit I was going after.
>
> Q      Okay.  But just so I'm clear, you didn't see anything?
>
> A      No.
>
> Q      You didn't see any footprints or cart marks through the produce department tracking juice, water, fluid, did you?
>
> A      No.
>
> Q      Did anybody ever tell you they saw the substance on the floor before you fell?
>
> A      No.

ECF No. 16-2 at 3 (Page Dep. 17:5 - 18:5); ECF No. 18-1 at 3 (Page Dep. 17:5 - 18:5).

In an affidavit submitted in support of her opposition to Supervalu's motion for summary judgment, Ms. Page declares in pertinent part,

> 1. On September 12, 2013, at approximately 11:30 a.m., I entered the Shoppers' grocery store located at 6111 Livingston Road, Oxon Hill, Maryland 20745 and walked directly to the produce department.

> 2. Approximately five minutes after entering the store, I slipped on grapes which had accumulated on the floor of the produce department.

> 3. I did not notice any customers or Shoppers' employees in the produce department from the time I walked into the Shoppers until moments after my fall.

ECF No. 18-6

Ms. Page has not produced "evidence that the dangerous condition had existed for a sufficiently long period of time for [Supervalu] or [its] employees to correct it or to warn [its] invitees." *Keene v. Arlan's Dep't Store of Baltimore, Inc.*, 35 Md. App. 250, 258, 370 A.2d 124, 129 (1977). Ms. Page suggests a period of five minutes was an adequate length of time for Supervalu to discover and remove the hazard. "What will amount to sufficient time depends upon the circumstances of the particular case, and involves consideration of the nature of the danger, the number of persons likely to be affected by it, the diligence required to discover or prevent it, opportunities and means of knowledge, the foresight which a person of ordinary care and prudence would be expected to exercise under the circumstances, and the foreseeable consequences of the conditions." *Moore v. American Stores Co.*, 169 Md. 541, 551, 182 A. 436, 440 (1936).

The co-manager of the Oxon Hill Shoppers grocery store, Mr. Hunter, testified that he walks the floor daily inspecting for any type of hazard. He walks the store at least once an hour. ECF No. 18-4 at 2 (Hunter Dep. 9:5-13). Mr. Hunter walked the store before Ms. Page's arrival; he cannot recall the precise time of this walk. *Id.* at 3 (Hunter Dep. 14:14 - 15:6). Johnnie Alexander Smith, the store director, testified he walked the entire store the day Ms. Page fell. He does not recall the last time he walked the produce section. ECF No. 18-3 at 4 (Smith Dep. 26:20 - 27:8). The following colloquy addressed Mr. Smith's inspection of the sales floor.

Q       Mr. Smith, you were asked about how often you inspected the sales floor and you said every hour and a half to two hours. Are the other managers on duty also inspecting the sales floor throughout the day?

A       Yes.

Q       In addition to inspecting the sales floor, when you say you do that sales tour – – floor tour, if you will, are you also out on the floor for a lot of other reasons?

A       Yes.

Q       Unrelated?

A       Yes.

Q       And when you are out on the floor for the other reasons and see anything on the floor, do you address it?

A       Yes.

Q       What percentage of your time is spent out on the sales floor generally speaking?

A       I would say probably 50 to 60 percent.

*Id.* (Smith Dep. 25:18 - 26:15).

Ms. Page purportedly slipped and fell on a *single* grape.  *See* ECF No. 18-2 at 5 (Cheston Dep. 21:13 - 16).  A single grape on the floor, an item small in stature, could have been missed despite Mr. Smith and Mr. Hunter walking the sales floor looking for hazards depending on the location of the fallen grape and/or the color of the fallen grape.  Moreover, since it has not been established exactly when Mr. Hunter and Mr. Smith walked through the produce area prior to Ms. Page's fall, it is likely the grape was not on the floor at the time of their inspections.  "It must be shown that the dropped fruit was on the floor longer than the interval between inspections, or remained for an unreasonable amount of time after discovery."  *Mack-Epps v. Supervalu, Inc.*, Civil Action No. WMN-11-530, 2011 WL 4985816, at *2 (D. Md. Oct. 18,

14

2011).  Based on the evidence presented, the court finds a five minute interval is not an appreciable length of time for Supervalu to discover and remove a single grape from the floor.

Moreover, Ms. Page is not entitled to a negative inference.  She has not demonstrated any fraudulent conduct by Supervalu in permitting the alleged recording of her slip and fall to be taped over by other surveillance in order to suppress evidence favorable to her.  Specifically, there is no evidence that an unidentified Supervalu employee, who did not preserve the alleged recording of Ms. Page's slip and fall and allowed that recording to be taped over automatically, did so at the instruction to erase any proof of a slip and fall attributable to Supervalu.  Similarly, no evidence has been presented that an unidentified Supervalu employee acted in accordance with company policy to retain only evidence which helps Supervalu prove the customer (in this instance, Ms. Page) was contributorily negligent or assumed the risk.  *Goin v. Shoppers Food Warehouse Corp.*, 166 Md. App. 611, 616, 890 A.2d 894, 897 (2006).

E.     *Created the Dangerous Condition*

"In an action by a customer to recover damages resulting from a fall in a store caused by a foreign substance on the floor or stairway, the burden is on the customer to produce evidence that the storekeeper created the dangerous condition. . . ."  *Rawls*, 207 Md. at 119, 113 A.2d at 408.  In her opposition to Supervalu's summary judgment motion, Ms. Page does not specifically charge Supervalu with creating the dangerous condition.  However through the designation of an expert witness, Barry Erik Parsons, FMP[1], Ms. Page contends Supervalu's violation of standards of care and best practices created the dangerous condition which caused her to slip and fall.  Supervalu has moved to exclude this expert.  Before determining if a genuine dispute as to a material fact exists regarding whether Supervalu created the dangerous condition, the court first considers Supervalu's motion *in limine* to exclude.

_____

[1] Food Service Manager Professional.  *See* ECF No. 17-3 at 1.

15

1.      *Supervalu's Motion in Limine*

a. *Standard of Review*

Federal Rule of Evidence 702 provides that an expert witness may testify in the form of an opinion or otherwise if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  In applying Rule 702 a district court acts as a gatekeeper, excluding unreliable expert testimony.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (holding that *Daubert's* gatekeeping obligation applies not only to scientific testimony but to all expert testimony).

In determining whether proffered expert testimony is reliable, a district court has broad discretion to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved, and no single factor is necessarily dispositive.  *See Kumho Tire*, 526 U.S. at 152-53.  "The court, however, should be conscious of two guiding, and sometimes competing, principles: (1) 'that Rule 702 was intended to liberalize the introduction of relevant expert evidence'; and (2) 'that due to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading.'"  *United States v. Hammond*, 381 F.3d 316, 337 (4th Cir. 2004) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)).

The proponent of expert testimony bears the burden of production to come forward with evidence to support its contention that an expert's testimony would be both reliable and helpful. *See Bourjaily v. United States*, 483 U.S. 171 (1987).  In *Daubert* the U.S. Supreme Court

reminded district courts that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595. Moreover, the U.S. Court of Appeals for the Fourth Circuit has held that "[a] court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct." *Westberry*, 178 F.3d at 261.

In addition to reliability, a district court must consider the relevance of the expert's proffered testimony. *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 454 n.4 (4th Cir. 2010) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). To be relevant, the expert's testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.*; *see also Westberry*, 178 F.3d at 260 (noting that a district court must analyze "whether the [expert's] opinion is relevant to the facts at issue"). This relevance requirement "has been aptly described . . . as one of 'fit.'" *Daubert*, 509 U.S. at 591.

As *Daubert* explained, a district court assessing whether an expert's scientific, specialized, or technical testimony satisfies the requirements of reliability and relevance should consider five non-exclusive factors: (1) "whether a theory or technique . . . can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) the extent to which the theory or technique has achieved "general acceptance" in the "relevant scientific community." *Id.* at 593-94 (citations omitted); *see also Kumho Tire*, 526 U.S. at 141 ("*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case."); *Md. Cas. Co. v. Therm-O-Disc., Inc.*, 137 F.3d 780, 784-85 (4th Cir. 1998) (finding that the *Daubert* factors were not

meant to be exclusively or rigidly applied).  The inquiry is a "flexible" one, "focus[ed] . . . on principles and methodology, not on the conclusions that they generate."  *Daubert*, 509 U.S. at 594-95.

In reviewing the reliability and relevance of an expert's testimony, a district court "should also be mindful of other applicable rules."  *Id.* at 595.  Federal Rule of Evidence 403 advises that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  Because the jury will often have "difficulty . . . evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'"  *Westberry*, 178 F.3d at 261 (quoting *Daubert*, 509 U.S. at 595).  Accordingly, expert testimony that is more likely "to mislead [the trier of fact] than to enlighten should be excluded" under Rule 403.  *See id.*

### b.  Pertinent Factual Background

Omitted from the <u>Background</u> section *supra* and relevant to the motion *in limine* to exclude is the matter of mats on the floor in the produce department.  Counsel for Supervalu raised the issue of the mats during Ms. Page's deposition.

> Q     Do you see these mats [on Exhibit 1] that are located on the floor?
>
> A     Yes.
>
> Q     Were they there on the day of your fall?
>
> A     No.
>
> Q     On the 20 or so prior times you had been to the Shoppers Food, have you ever gone through the produce section?

A       Yes.

Q       When you've gone through the produce section, have you ever noticed these mats were down?

A       Yes.

Q       Specifically did you ever notice they were down in the area where the strawberries, grapes, watermelons would be located?

A       Yes.

Q       And they were down, not the day of the accident, but prior to you going there?

A       Yes.

Q       You said you shop there on a regular basis.   Since the accident, have you noticed these mats have been down?

A       Yes.

ECF No. 18-1 at 5 (Page Dep. 25:18 - 26:18).

Ms. Page's counsel inquired about Supervalu's use of mats when he deposed Mr.

Cheston, the seafood manager who assisted Ms. Page after she fell.

Q       The only purpose for now of this photo [Exhibit 1], when I say mats, I'm specifically speaking of the mats that you see here on the floor right out front of the produce area, okay?

A       Right.

Q       I just want to make sure we are all on the same terms.   Are there any internal policies at Shoppers regarding placing mats on the floor in the store generally?

A       Well, like the grape area, the areas – – not really, not that I recall.

Q       Okay.   You said in the grape area.   You specifically stated that part.   Was there any reason why you stated in the grape area versus just the general store?

A       No.

Q      Are these mats put down on a daily basis?

A      When we have them.

Q      What do you mean when you have them?

A      Because sometimes the gentleman will come in that takes the mats to get them clean.

Q      Okay.

A      He will take them up and put more down.

Q      Okay.  And when he – – when the gentleman that cleans them, when he takes them up and puts more down, what is the timeframe usually between him picking them up and putting them down?  Are we talking minutes?  Hours?  Days?  Weeks?

A      Well, I wouldn't know that.

Q      Is there a specific employee or title for an employee that puts these mats downs?

A      No, there is not.

       MR. DUNN:  You said "employee."  It may be an outside service.

BY MR. HOLLEY:

Q      Does Shoppers put the mat down or does an outside service put the mat down?

A      The outside service will bring the new ones in and take the old ones up to have them cleaned.

Q      Who decides where these mats are placed – – I guess that's the best way to ask it – – a Shoppers employee or the outside service?

A      A Shoppers employee.

Q      Is it the general manager that makes that decision or is it another employee that makes that decision?

> A    It is the manager of the produce department.
>
> Q    Okay.  And I apologize for beating a dead horse here. Are they put down daily or once they are put down, they sit there until the gentleman comes and picks them up to clean them?
>
> A    No.  They are put down daily.
>
> Q    What time of day approximately are they put down?
>
> A    When they come in early in the morning.

ECF No. 18-2 at 3 (Cheston Dep. 13:11 - 15:21).

Store director Mr. Smith discussed the use of mats at the Oxon Hill Shoppers grocery store during his deposition.

> Q    Is there a specific Shoppers employee that determines where these mats are to be placed?
>
> A    No.
>
> Q    Who decides – – for example, in this picture, there are two mats near where the grapes and strawberries are.  Who would usually decide to put those down there?
>
> A    I'm not sure who decides.  That's typically where we place them, in front of certain sections throughout the produce department.
>
> Q    So typically there would be mats placed out in front of where the grapes would be located in the produce department?
>
> A    Usually, yes.
>
> Q    Are they put down in the morning or are they always down on the floor?
>
> A    They are out throughout the day.  When they clean the floors at night, they pick them up and then we'd put them back down first thing in the morning before the store opens.
>
> Q    And I believe I was told the store opens around 6 o'clock in the morning on Thursdays?

A       Yes – – well, 6 o'clock every day.

Q       Every day?

A       Yes.

Q       Would there be any reason why these mats would not be located on the floor outside the grape section in the produce department?

A       Not that I can think of.

Q       If you were walking the floor and saw that the mats weren't down, what would you do?

A       I'd look for the mats to place them throughout different sections throughout the produce department.

Q       Were there any other areas in the store outside of the produce department where these mats are placed?

A       The only place that I can think of would be in front of the ice section, where we sell ice. And then when it rains, we have some in front of the front door.  When it rains, we will pull those out.

Q       Okay.  And the mats are placed down by a specific employee or just anybody?

A       Just any associate.

ECF No. 18-3 at 2 (Smith Dep. 14:15 - 16:14).  Mr. Smith does not recall whether mats were on the floor in the grape area the day Ms. Page fell.  He also does not recall whether mats covered the floor in other parts of the produce area the day Ms. Page fell.  Since mats are normally covering the floor in the produce area, Mr. Smith assumed mats were present.  He would have noticed if the mats were absent.  *See id.* at 3 (Smith Dep. 22:6-16).[2]

---

[2] Q       Okay.  Do you remember if these mats that are shown in Exhibit 1 were down on the day of the accident?
A       I don't recall if they were there.  They are usually there.
Q       Do you recall if they were down in any other parts of the produce section the day of the accident, when she fell?

During the deposition of Mr. Hunter, the co-manager, Ms. Page's counsel inquired about the use of mats in the produce area.

Q      Okay.  Let me show you a photograph that's been marked as Exhibit 1 for Mr. Emanuel Cheston.

        When I speak of mats, I'm talking about the two mats you see here.

A      Okay.

Q      Just so you understand what I'm saying.

        The mats that are located here – – well, first, do you recognize this picture?

A      I do.

*                              *                              *

Q      These mats here, who puts them down?

A      Well, when – – it is a company that comes in that brings the mats to the store and so they stay there.  The overnight people clean.  They roll the mats up, clean and the people who come in in the morning that open that department roll them back down.

Q      Okay.  And are they placed in the same areas every day?

A      Right.

Q      And is this one of the areas that the employees are supposed to put the mats down on a daily basis?  And when I say area, I'm talking about Exhibit 1 for Cheston.

A      They are.

Q      Is there any reason why – – and I'll call it the grape section just because I know there are grapes there.  Is there any reason why these mats wouldn't be placed down in the grape section?

A      No.

---

        A      I don't recall.  They are usually there.  I would have noticed if they were not there more than I would have noticed whether they were there.

> Q      If you were walking the store and you noticed the mats weren't in this specific location, what would you do?
>
> A      I would figure out where they were because that would be odd.  They are always there.

ECF No. 18-4 at 2 (Hunter Dep. 10:13 - 21, 11:7 - 12:8).

Ms. Page retained Mr. Parsons to provide his expert opinion in the area of grocery store safety and maintenance.  Mr. Parsons conducted an on-site inspection of the accident scene where Ms. Page slipped and fell.  In his August 22, 2014 report Mr. Parsons expressed his opinions about Ms. Page's accident via the following five findings:

> 1.      Grapes on the floor created a dangerously slippery condition that caused Page to slip and fall.
>
> 2.      Shoppers displayed grapes in unsealed bags on a sloped display that was higher than the produce stop at its base, making it foreseeable that grapes would be on the floor.
>
> 3.      Mats should have been provided around the grape display to prevent dangerously slippery conditions.
>
> 4,      Shoppers' lack of a structured floor maintenance and inspection program increased the likelihood that patrons would encounter dropped produce and would be exposed to dangerous conditions.
>
> 5.      Shoppers' actions violated the standard of care for safe retail operations and created the dangerous conditions that caused Page to slip and fall.

ECF No. 17-6 at 9-10; ECF No. 19-2 at 9-10.

> *c.  Summary of Arguments*

Supervalu claims Mr. Parsons' proffered opinions fail both the reliability and relevance prongs under *Daubert*.  Specifically, with regard to the reliability prong, Supervalu contends Mr. Parsons' opinions are not supported by an adequate factual basis.  Supervalu also asserts Mr. Parsons has not applied methods and reasoning which are admissible before a trier of fact.

Regarding Mr. Parsons' qualifications as an expert witness, Supervalu notes the absence of any professional license obtained by Mr. Parsons in the field of operational safety. In addition, Mr. Parsons has not been published on the issue of floor care maintenance or retail floor maintenance. Supervalu further notes Mr. Parsons' absence from any local safety committees. Supervalu discounts Mr. Parsons' membership with the American Society for Testing and Materials ("ASTM") F13 since membership is unlimited. ECF No. 17-1 at 13.

As for Mr. Parsons' factual basis, Supervalu argues Mr. Parsons improperly assumes Ms. Page slipped on a grape. A review of Ms. Page's deposition testimony refutes this assumption. Ms. Page could not identify the substance which caused her to slip and fall. Next, Supervalu asserts Mr. Parsons opined about the cause of Ms. Page's fall without interviewing any witnesses, parties or store employees. Third, although Mr. Parsons conducted a site inspection where Ms. Page slipped and fell, this inspection occurred a year after the incident. Mr. Parsons conceded at his deposition that he did not ensure the layout of the store had not changed between the date of the incident and his site inspection. *Id.* at 13-14.

Supervalu challenges Mr. Parsons' use of and reliance upon the Brungraber Mark IIIB, a slip meter used to measure the slip resistance of walking surfaces. Mr. Parsons acknowledged during his deposition that he is relying upon the Brungraber Mark IIIB for the first time in any litigation in providing an opinion. The use of the Brungraber Mark IIIB for this litigation is also the first time Mr. Parsons has used the slip meter outside of his employer's premises. Mr. Parsons received training on the use of this device. That training consisted of a one day course taught by a co-employee as well as independently reading pertinent material.

Furthermore, as revealed during his deposition, Mr. Parsons relies upon industry standards and best practices, not controlling law, in opining about Supervalu's alleged violations.

Q        Number 3, you said that mats should have been provided. Once again, there is no duty, no law, state, county, federal, or local ordinance that requires mats, correct?

A        No, just standards that are out there and best industry practices.

Q        Standards and best industry practices are all nice, but they are nothing more than recommendations, correct?

A        Correct.  You don't have to do any of that stuff to be safe.

ECF No. 17-5 at 11 (Parsons Dep. 37:14 - 38:2).

Supervalu contends Mr. Parsons' proffered testimony fails the relevance prong of *Daubert* because the method of displaying grapes, the absence of mats on the floor in the grape area, and the lack of structured floor maintenance plan and inspection plan do not require expert testimony.  These matters are within the common knowledge of a jury.

In her opposition Ms. Page contends Mr. Parsons has the professional credentials and industry related experience to give an opinion in the area of grocery store maintenance and safety.  "Parsons has twice been recognized by a court of law as a properly credentialed expert witness and allowed to provide trial testimony regarding grocery store standards of care."  ECF No. 19 at 3.  Mr. Parsons has 10 years of experience managing a supermarket and over 25 years of food industry related experience.  He received a certificate in Principles of Safety from the National Safety Council.  *See* ECF No. 19-1 at 1 (Parsons Aff. ¶ 6).  Mr. Parsons is a certified Food Management Professional and ServSafe Instructor.  *Id.* (Parsons Aff. ¶¶ 7-8).

Ms. Page rebuffs Supervalu's assertion of Mr. Parsons' inaccurate factual basis by failing to interview personally the witnesses.  Ms. Page notes Supervalu does not cite any legal authority mandating an expert witness personally interview all parties and non-party witnesses.  Although Mr. Parsons did not personally interview the witnesses, he read the deposition transcripts of

Plaintiff and all witnesses identified by Supervalu.  Further, Mr. Parsons read the Complaint and each party's answers to interrogatories.  In addition, he reviewed photographs of the accident scene.  Finally, Mr. Parsons conducted an on-site inspection of the area where Ms. Page slipped and fell.  Mr. Parsons' opinions, Ms. Page argues, are supported by admissible evidence.  ECF No. 19 at 6.

Next, Ms. Page rejects Supervalu's contention that Mr. Parsons lacked sufficient experience to operate the Brungraber Mark IIIB slip meter.  "[Supervalu's] accusation is not supported by expert testimony of its own and does not articulate how the equipment was used improperly."  *Id.* at 6-7.  Ms. Page claims the record is replete with evidence establishing Mr. Parsons' qualification to use the machine, namely, (a) his hands-on training on June 10, 2014, (b) the study of industry standards from ASTM F13 Committee for the use of the Brungraber Mark IIIB, (c) Mr. Parsons' testing of the Brungraber Mark IIIB between June 10, 2014 and August 7, 2014, the date of the on-site inspection and (d) the machine Mr. Parsons used was validated and calibrated by the manufacturer.  *Id.* at 7.

Although Ms. Page testified she was not certain what caused her to fall, Supervalu's own employee testified that he found a smeared grape on the floor where Ms. Page fell.  This employee, Mr. Cheston, told Mr. Smith, the store director, that Ms. Page slipped on a grape.  The site of Ms. Page's fall was directly adjacent to the grape display.  Mr. Parsons' opinion that a grape caused Ms. Page to fall is therefore based on reliable and admissible evidence.  *Id.* at 8.

Even though Mr. Parsons inspected the site of Ms. Page's fall approximately 11 months after the incident, there is no evidence the layout of the store changed in the interval.  In answering an interrogatory Supervalu admitted no changes have been made to the location of the incident.  *See* ECF No. 19-9 at 2.  Mr. Parsons used photographs taken sometime after the

incident to identify the area where Ms. Page fell and then conducted his on-site inspection. "Therefore, [Supervalu's] argument that the layout of the store changed between the time of the accident and Parsons['] on-site inspection is not supported by any evidence and should be rejected." ECF No. 19 at 9.

As for recognized industry standards, Maryland law recognizes an expert witness may opine about a party's liability based upon industry custom and practice.  "In his report, Parsons relies upon multiple industry publications which articulate the standard of care applicable to commercial establishments like grocery stores."  *Id.* at 10.  Thus, Mr. Parsons' opinions are properly supported and the court should reject Supervalu's argument to the contrary.

With regard to the relevance prong, Ms. Page claims Mr. Parsons' opinions "will assist the jury members with regard to what the industry considers to be recurring hazards and how supermarkets deal with those recurring hazards, subject matters not within the common knowledge of lay persons."  *Id.* at 11.  Further Mr. Parsons' opinions are based on his results of slip resistance testing, through the use of the Brungraber Mark IIIB.  The test results revealed grapes on a tile floor are as dangerous as a sheet of ice, a subject matter outside the common knowledge of layman.  Finally, Ms. Page asserts Mr. Parsons' testimony is necessary to negate Supervalu's defense that it could not have foreseen grapes falling to the floor and posing a danger to customers.

### d. Analysis

The court has reviewed Mr. Parsons' deposition testimony and his curriculum vitae.  The court agrees with Supervalu that Mr. Parsons lacks the education and experience to provide expert testimony regarding the slip resistance of the flooring material in the area where Ms. Page fell.  Mr. Parsons' formal educational background consists of an Associate Degree in Science-

Business Management received in 1984.   In reviewing his professional credentials, two

certificates (Certificate in Principles of Safety and Advanced Safety Certificate), on the surface,

appear generally relevant.   These certificates were obtained from the National Safety Council.   In

reviewing the description of these courses,[3] they do not provide specific education or training

regarding the slip resistance of flooring.   Unlike Ronald A. Fermano, Jr., a colleague of Mr.

Parsons at Robson Forensic, Inc., Mr. Parsons is not a certified Tribometrist.[4]   A Tribometrist is

---

[3] "The Advanced Safety Certificate program helps safety professionals drive fundamental safety change within their organization.  The ASC[TM] award can be earned with 12 days of coursework.

    The ASC[TM] program helps you:
- learn to assess your organization's unique safety needs
- create comprehensive safety plans customized to your organization
- implement your own customized, comprehensive safety programs effectively"

National Safety Council, http://www.nsc.org/learn/Safety-Training/Pages/workplace-training-advanced-safety-certificate-program.aspx (last visited Feb. 25, 2015).

Principles of Occupational Safety and Health ("POSH") training is an information-packed four-day course which trains professionals from a variety of industries.

POSH delivers a solid curriculum of important safety concepts and terminology, with emphasis on best practices for implementing and managing a safety program.  The most important components of occupational safety and health are presented, as well as ways to put them into practice to help prevent injuries and related costs.  The certificate also qualifies you to pursue the Advanced Safety Certificate (ASC).

What You Will Learn:
- How to examine real-life histories to help you avoid mistakes and maximize the effectiveness of your safety initiatives
- Uses and benefits of record-keeping to prevent injuries and illnesses and meet OSHA requirements
- How to develop an[] emergency action plan
- How to effectively plan and conduct safety inspections
- The impact of industrial hygiene and HazCom standards on your safety plan

National Safety Council, http://www.nsc.org/learn/Safety-Training/Pages/Courses/principles-of-occupational-health-safety.aspx (last visited Feb. 25, 2015).

[4] *Fermano Curriculum Vitae*, http://www.robsonforensic.com/upload/cv/FermanoRonald_js_wm.pdf (last visited Feb. 25, 2015).

a professional who studies slip resistance.[5]   During his deposition Mr. Parsons disclosed what

certification, if any, exists for slip meters.

> Q       You didn't go to any seminars, correct?
>
> A       Correct.
>
> Q       You weren't certified, correct?
>
> A       There is no certification on the Brungraber Mark III.
>
> Q       Or the English XL?
>
> A       The English XL, there is a certification on that one, which I'll – – that's why I did not use the English XL; I'm getting certified in November on that one.
>
> Q       So you only use the Brungraber, and there is no certification for that?
>
> A       Correct.
>
> Q       And you weren't tested on that either?
>
> A       What do you mean by tested on it?
>
> Q       I mean, were you required to perform a demonstration of use of it and have somebody say whether you passed or failed?
>
> A       No.  There is no such thing as that for the machine.

ECF No. 17-5 at 5 (Parsons Dep. 14:14 - 15:11).  Considering Mr. Parsons' lack of specific

education and the lack of experience using the Brungraber Mark IIIB (which he used for the first

time, outside the laboratory, during his on-site inspection in this case), the court will grant

Supervalu's motion in limine to exclude Barry Erik Parsons' proffered testimony and report as to

the slip resistance of flooring material.  *See Michaels v. Taco Bell Corp.*, Civ. No. 10-1051-AC,

2012 U.S. Dist. LEXIS 140283, at *16 (D. Or. Sept. 27, 2012) (finding David Karlin, a licensed

---

[5] *A comparison of two slip meters*, Zurich Services Corporation http://www.zurichservices.com/ZSC/REEL.nsf/e7d01e983421df7fc125710e00503352/940489e7eecfcfabc1257a910 061185e/$FILE/comparison_of_two_slip_meters_rt_4-3.010_20121008.pdf (last visited Feb. 20, 2015).

mechanical engineer with two degrees from the Massachusetts Institute of Technology, who has substantial experience as a consulting engineer, particularly with respect to vehicle accident reconsideration and a Tribometrist certified to use the English XL Tribometer, qualified as an expert witness for purposes of Federal Rule of Evidence 702 and *Daubert's* requirements); *Ruston v. Office Depot, Inc.*, Case No. 3:10-CV-05057-DGK, 2011 U.S. Dist. LEXIS 119558, at *3 (W.D. Mo. Oct. 17, 2011) (noting Defendant did not dispute the qualifications of Plaintiff's expert Dr. Gary Nelson, a registered Professional Engineer, Certified Safety Professional, and Certified Variable Incidence Tribometrist, who holds a Master's Degree in Industrial Safety Engineering and Ph.D. in Interdisciplinary Engineering "with a focus on Workplace, Premises, Product Safety, Human Factors, and Industrial Engineering.").

Mr. Parsons' proffered testimony is not limited to the slip resistance of the tile floor.  Ms. Page has designated him as an expert in the "area of grocery store maintenance and safety."  His curriculum vitae reflects over 25 years of food industry related experience and more than 10 years of experience managing a supermarket.  As a general manager for (a) Stauffers of Kissel Hill, (b) Funk's Farm Market and Garden Center Inc., (c) Wendy's Target Food Systems, (d) Roy Rogers/Hardee's Inc., (e) CVS Pharmacy and (f) Rite Aid Corporation, among Mr. Parsons' responsibilities were the safety of patrons and accident prevention.

When presented with a proffer of expert testimony, a court must determine "whether the expert is proposing to testify to (1) scientific[, technical, or specialized] knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  *Daubert*, 509 U.S. at 592. Although Mr. Parsons has extensive experience in retail operations safety and is apparently conversant with industry standards regarding the safety of patrons and accident prevention, the

court nevertheless finds the "area of grocery store maintenance and safety" does not quality as nor constitutes scientific, technical or specialized knowledge.

Even if the "area of grocery store maintenance and safety" constituted specialized knowledge, the court finds Mr. Parsons' proposed testimony will not assist a jury to understand or determine a fact in issue.  It is common knowledge that a grape on the floor creates a dangerously slippery condition.  Further, placing mats on the floor to prevent dangerously slippery conditions clearly lies within the range of a jury's common knowledge and experience.  Based on such common knowledge and experience a jury can, without the assistance of expert testimony, determine whether placing unsealed bags of grapes on a sloped display higher than the produce stop would make it foreseeable that some grapes would fall on the floor.

Accordingly, in its role as gatekeeper, this court cannot permit Mr. Parsons' proposed testimony in the "area of grocery store maintenance and safety."

2.      *Claim Viable Without Expert Testimony*

The exclusion of Mr. Parsons as an expert witness does not necessarily preclude further consideration of Ms. Page's assertion that Supervalu created the dangerous condition.  Ms. Page testified no mats were present when she slipped and fell.  Supervalu's employees Mr. Smith and Mr. Hunter cannot state with certainty but assumed mats were on the floor.  As Judge Nickerson noted in the *Mack-Epps* case,

> While it again remains unclear whether mats were properly in place, or whether the danger is so obvious that the mats are merely a courtesy, a jury could find Shoppers had a duty to follow its own best practice and protect its customers from the foreseeable danger posed by fallen produce.

2011 WL 4985816, at *3.

Mr. Smith, the store director, testified that mats are routinely placed in three areas in the grocery store: (a) in the produce department, (b) in the area where ice is stored, and (c) by the front door during inclement weather, *i.e.,* rain or snow.  Mr. Smith's testimony reveals Supervalu was on notice about certain dangerous conditions within the store.  *See Mack-Epps*, 2011 WL 498516, at *3 ("[B]oth Mr. Smooth and Mr. Ferguson provided evidence that Shoppers customarily placed mats underneath 'wet fruit,' strengthening the claim that this was a foreseeable danger.").  This matter cannot be resolved at the summary judgment stage and therefore must be tried before a jury.  Supervalu is not entitled to summary judgment because there exists a genuine dispute of material fact, namely, whether Supervalu created the dangerous condition.

## CONCLUSION

For the foregoing reasons, the court finds there is genuine issue as to a material fact and thus Supervalu is not entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a). Supervalu's motion *in limine* to exclude Plaintiff's Expert Barry Erik Parsons, FMP will be granted.  An Order will be entered separately.

<u>March 26, 2015</u>               _____/s/_____
Date                              WILLIAM CONNELLY
                                  UNITED STATES MAGISTRATE JUDGE